JUDGE SCHOFIELD

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

## 17 CV 6536

YAN LI,

                    Plaintiff,

    - against -

THE BANK OF NEW YORK MELLON

                  Defendant,

Case No.:

## COMPLAINT
### JURY DEMAND

The plaintiff, YAN LI ("Li" or "Plaintiff"), proceeding pro se, alleges as follows:

## JURISDICTION AND VENUE

1. Plaintiff brings this action to recover damages caused by the defendant's violations of the Sarbanes-Oxley Act of 2002 (the "Act"), 18 U.S.C. §1514A.
2. This Court has jurisdiction pursuant to 28 U.S.C. §1331 and §1343, 18 U.S.C §1514A (b) (1) (B) and 29 C.F.R. § 1980.114(a).
3. Venue lies in this judicial district pursuant to 28 U.S.C. §1391(b), as this action arose, in substantial part, within the Southern District of New York, where the unlawful employment practices and statutory violations alleged herein occurred, where the defendant resides and many of the records pertinent hereto are maintained.
4. On July 16, 2015, plaintiff timely filed a complaint with the U.S. Department of Labor setting forth that defendant violated the Act.
5. On June 2, 2017, pursuant to 29 C.F.R. §1980.106, plaintiff objected to the findings by the U.S. Department of Labor.
6. On June 2, 2017, pursuant to 18 U.S.C. §1514A(b)(1)(B) and 29 C.F.R. §1980.114(b), plaintiff filed a Notice of Intent to File a Complaint in the U.S. District Court ("Notice of Intent") with the Office of Administrative Law Judges, Chief Administrative Law Judge Stephen R. Henley, and served copies of same on the defendant, and the Assistant Regional Administrator of Occupational Safety and Health Administration,

and the Assistant Secretary of Occupational Safety and Health Administration, and the Associate Solicitor of the Division of Fair Labor Standard, U.S. Department of Labor.

7. On July 25, 2017, Chief Administrative Law Judge Stephen R. Henley issued an Order Suspending Administrative Proceedings Pending Filing of Federal District Court Complaint on the ground that the Complainant will exercise his right to pursue his claim in federal district court.

8. Plaintiff is filing this Complaint at least 15 days after the aforesaid Notice of Intent was filed and served.

## **PARTIES**

9. Plaintiff resides at 5 Bordens Brook Way, Holmdel, NJ 07733.

10. Plaintiff has had a distinguished career of more than 21 years in the financial services industry. Plaintiff's areas of expertise include financial modeling, product structuring and quantitative research for the trading of derivatives.

11. Plaintiff received his undergraduate degree in 1982 from the University of Science and Technology of China. In 1988, plaintiff was awarded a Ph.D. in physics from the City University of New York. Prior to becoming employed by BNY Mellon, plaintiff worked in the fixed income derivatives and/or equity derivatives groups for several prominent financial services firms, including Salomon Brothers, Lehman Brothers, CDC IXIS, and Merrill Lynch.

12. Defendant The Bank of New York Mellon ("BNY Mellon") is an American worldwide banking and financial services holding company. It was formed on July 1, 2007, as a result of the merger of The Bank of New York and Mellon Financial Corporation.

13. Defendant BNY Mellon's headquarter is located at 225 Liberty Street, New York, NY 10286.

14. Defendant BNY Mellon is a publicly traded company on the New York Stock Exchange, its trading symbol is BK.

15. Defendant BNY Mellon has a class of securities registered under section 12 of the Securities and Exchange Act of 1934 (15 U.S.C. §78l).

16. Defendant BNY Mellon is required to file reports under section 15(d) of the Securities and Exchange Act of 1934 (15 U.S.C. §78o(d)).

17. At all relevant times, defendant BNY Mellon was and is an "employer" and "covered person" as defined by the Act.

18. At all relevant times, plaintiff was employed by defendant BNY Mellon as a quantitative analyst until May 21, 2015.

19. At all relevant times, plaintiff was a "covered employee" under the Act.

## FACTS

20. In April 2008, BNY Mellon hired plaintiff to work as a senior quantitative analyst in the quantitative analytic group of the Global Markets Derivatives Sales & Trading desk ("desk").

21. As an expert in quantitative analysis (sometimes referred to as a "quants"), plaintiff assisted the desk in the modeling, pricing and risk managing of various derivatives products.

22. During the process, plaintiff identified many errors in the existing model frameworks. Many of them later proved to be intentionally engineered as embedded "bugs", in order to create millions of dollars of false profits for the desk.

23. Upon discoveries, plaintiff always reported and explained the issues to his supervisor and management, and recommended to correct the errors as soon as possible.

24. Instead of correcting the errors without delay, plaintiff's supervisor and management often failed to take action in order to retain millions of dollars of false profits for as long as possible. Furthermore, BNY Mellon shielded the wrongdoers and retaliated against the plaintiff, in response to his reports of the wrongdoings.

25. In or about mid-2010, plaintiff accidently identified the PRDC 3s6s basis problem when helping the traders to research for the cause for the unexplainable PL losses. At the time of his finding, plaintiff truly believed it was just a simple booking error, as the dummy pay leg, which was set to "LIB3M" (three month curve), was not offsetting the dummy receive leg, which was set to "LIBOR" (six month curve), resulting a faked 3s6s basis position and therefore faked PL. Plaintiff immediately reported the error to his supervisor, Dongsheng Lu ("Lu"). Lu told plaintiff that it was a simple operational error and it would be taken care of.

26. But months later, at the beginning of February 2011, as one of the affected trades, trade ID 43097, approached its trigger determination date, plaintiff checked again and found the error was not fixed. Plaintiff spoke to Lu again but he strangely refused to discuss the issue. So plaintiff dug a little bit deeper and checked the revision history and found that, in fact, the trade was originally booked correctly on September 12, 2008, but was modified half year later on April 2, 2009 by Dee Dhanraji ("DD"), a back-office employee. At that point, plaintiff was convinced that this was not a simple "operational error" and filed the Incident Report 383206 ("Incident Report") with BNY Mellon's Compliance and Suspicious Incident Reporting System on February 19, 2011.

27. After an initial meeting with the Compliance officer, BNY Mellon made no meaningful investigation and no correcting efforts, not even after the trade 43097, reported in the above February 19, 2011 "Incident Report", was triggered on March 2, 2011 with $1.8 million loss. On March 7, 2011, plaintiff had to chase the Compliance officer, William E. Shea, down to follow up with the investigation.

28. It is clearly anything but a careless operational error. It's highly unlikely that the back-office employee, DD would act on her own, as the LIBOR leg is dummy, which was not on the trades' confirmation forms and she lacked the knowledge and/or motivation to modify such complicated trades' booking months later, during the mid-cycle of the trades. Besides, on April 2, 2009, the 3s6s spreads were not zero, the change would result in several hundreds of thousands of dollars "profits", for which DD could not execute without any instruction from the desk.

29. Moreover, only after plaintiff's persistent push, the correcting process finally took place on March 18, 2011. After getting the authorization from the department heads, Lu instructed back-office employee DD to make the correction for the remaining PRDC trades with the incorrect 3s6s booking. However, plaintiff, a senior quants who reported the issue, was kept out of the loop completely until the mid-office employee, Edouard Dufresne, forwarded the email to him. In fact, it is such an obvious fraud that the then Desk Head, Rod Prat, hired just a year ago from Goldman Sachs, resigned soon after. But to everyone's surprise, BNY Mellon classified the incident as mere operational error. Neither DD nor Lu was disciplined.

30. Eventually, the desk had to write-down a few millions more when the other affected trades were corrected, plus the desk had to increase the reserve by $15 million dollars, which resulted in a net book value correction of about $20 million dollars for the PRDC book.

31. The above incident was by no means the only one that the desk recklessly used to falsify profits by manipulating the complicated derivative trades' bookings. Take a look at another example, on February 25, 2011, trader Raymond H. Tsang complained about $-750,000 loss over the weekend and later plaintiff found the loss was not due to the actual market movement but the fact that the FX volatility was set at far above the market level.

32. In fact, there were so many hidden bugs, even accounted for the increased reserve of $15 million dollars, the PRDC book still lost over $50 million dollars cumulatively, from 2010 till the end of 3rd quarter, 2014, when the desk unwound the whole book. A significant portion of the losses can be attributed to the embedded bugs in the model.

33. In response to plaintiff's doing the right thing to identify and correct the bugs in PRDC model, especially the 3s6s errors, BNY Mellon subjected plaintiff to various retaliations. For example, plaintiff's annual bonus payment was cut by 77% in February 2011(for the year of 2010), and for the year of 2011, when plaintiff escalated the PRDC issues to the BNY Mellon's Compliance, his performance rating was downgraded by a notch.

34. The PRDC book is not the only place such fraudulent scheme is deployed by the defendant. In 2012, the desk's Bermudan book ("BERM") mysteriously lost over $10 million dollars, which essentially equaled to the whole year's sales credits. The desk management tried to pin the blame on the model's imperfection and decided to develop the Q-model. In or about mid-2013, plaintiff was asked to tackle the task after another quant was unable to make much progress for months. Prior to that, the BERM model in production was handled entirely by Lu and his team, excluding plaintiff.

35. In a very short period of time, plaintiff was able to make the Q-model working. But during analyzing the impact for the BERM portfolio, plaintiff found that for many trades, the production's number could never be reproduced. By conducting various limiting case tests, plaintiff concluded that the production's model valuations were erroneous. To correct the bug would cost the BERM book about $1 million dollars write-down. However, the desk management insisted to postpone the correction until the Q-model was approved and implemented.

36. By the mid of February 2014, the Q-Model was approved by BNY Mellon's Risk department.

4

37. However, on February 19, 2014, plaintiff uncovered and reported another "bug", where trades with day-count as "Actual/Actual" ("AA") on the floating leg were mistreated as "Actual/360" ("A360"). This error affected about 11 non-offsetting trades in the existing production system. James McAuliffe ("McAuliffe" or "Jim"), the desk head, was well informed about the nature of the bug: it is a booking issue, and it would cost the desk another $833K write-down. Also, there's a very troubling nature associated with this bug: the bug only existed in the production system for producing the official, end of day positions and PL numbers, while the trading system the traders are using for live pricing, is free of the bug.

38. In fact, embedding the "bugs" into the derivatives valuation code is the worst kind of securities fraud. Apart from its obscured nature that can be easily concealed, those "bugs" are alive and can grow into something much more damaging than their initial design as little "boosters", because the traders didn't know the "boosters" were fake and hedged against them.

39. In addition to numerous face-to-face meetings with James McAuliffe, the desk head, and Edward O'Hare, the BERM head trader, and Dongsheng Lu, the head of quants group, plaintiff reiterated to McAuliffe about the nature of the "bug", which was a booking issue and should be corrected ASAP in an email dated April 10, 2014. But McAuliffe insisted to postpone the corrections for this bug, as well as the errors aforementioned in paragraph "35", in order to keep a total of about $2 million dollars of false profit.

40. Normally, pushing a new model release into production is a routine assignment for IT. But in the Q-model case, the BNY Mellon's IT was not helping but engaging in various obstructive activities, including intentionally sabotaging the system. Plaintiff had to make tremendous efforts and overcame lots of unnecessary obstacles to push the Q-model into production on April 24, 2014 for the front-office ("FO"), two months after BNY Mellon Risk approved all the changes.

41. However, on April 28, 2014, McAuliffe, the desk head, pretended to be not aware of anything about the bugs, which in fact were discussed extensively with him in the past few weeks, claimed that "why haven't any of these things been discussed with me. We don't have the flexibility to lose $1.4mm on a model adjustment that doesn't materially impact the business."

42. Moreover, McAuliffe made his intention of resisting the correction clearer in the April 30, 2014 email, and ordered the roll back of the Q-model for FO and reversed the correction for the "bugs", in order to keep about $2 million dollars false profit for the BERM book, even though the issues were thoroughly studied and discussed in the past months, and the Risk and Finance had already approved all the changes. In the end, with plaintiff's persistent push, the FO switched back to the corrected Q-model on May 12, 2014.

43. Surprisingly, McAuliffe didn't stop his obstructive efforts then and there. Together with Joseph Mancino ("Mancino" or "Joe"), the desk's Business Manager, McAuliffe orchestrated more schemes to obstruct the roll out of the Q-Model for BO (Back Office), who maintains and produces the official numbers for BNY Mellon.

44. The email chain about "new berm model for BO" depicts the efforts made by Mancino & IT, under the instruction of McAuliffe, to obstruct the Q-model roll out, and more importantly, the correcting process for removing about $2 million dollars fake profits.

45. On May 09, 2014, plaintiff urged IT to start the roll out of Q-model, the new BERM model for BO.

46. On May 13, 2014, the process was stopped by Mancino, the desk's Business Manager, using the excuse that "Bela Ratner is the only resources in IT that can implement the required changes".

47. On May 20, 2014, during the email exchange between Mancino and Finance, Mancino revealed that Jim (McAuliffe) is behind it.

48. On May 20, 2014, Bela finally started the implementation process.

49. But on May 22, 2014, Mancino interfered again, using the same excuse of "only one resource (Bela) in technology that can manage the process" even though Bela had already agreed to do the work on May 20, 2014.

50. It was not until May 29, 2014 when the new BERM model was finally installed for BO, actually by Niels Lauritzen, an IT employee designated for the desk, with Bela just taking a stand-by role. So it was never the case that "only one resource (Bela) in technology that can manage the process" as Mancino repeated claimed, but an excuse to delay the roll out of new BERM model for BO.

51. The aforementioned (paragraphs "34" through "50") Q-model implementation and fake positions/profits removing is such an obviously right thing to do, plaintiff was surprised to find out the retaliations he's going to receive from BNY Mellon.

52. The chain of email about "Florham Park PCs will be moved on 8/21" depicts the retaliatory efforts by IT (Mancino & McAuliffe behind it) to harass/intimidate plaintiff and sabotage his work at BNY Mellon.

53. On August 20, 2014, Christopher Vivinetto in IT sent an "Importance High" email to the quants group to inform them "Florham Park PCs will be moved on 8/21". As 2nd-ranked quants in the quants group, plaintiff was not copied in the email, especially when plaintiff's seat/workstation was about to be eliminated.

54. On August 21, 2014, IT informed Lu, plaintiff's supervisor and the quants group head, that "Yan Li, etc." was targeted to lose the seat/workstation on that day. Again, plaintiff was not informed by either Lu or IT.

55. In fact, it was Shuchun Wang, a junior quants in the quants group, forwarded the email to plaintiff to give him a chance to save his work.

56. It was such an offensive move that, after plaintiff's protest, Lu, plaintiff's supervisor and the quants group head, intervened. IT informed the quants group the list "was vetted with Joe Mancino", who had just helped McAuliffe, the desk head, to obstruct the roll-out of the Q-model for the BERM book, with the intent to keep the about $2 million dollars falsified profits. Apparently, it was not a "limited resource" issue as Mancino /IT claimed but a retaliatory move, because Mancino "decided" it was more important for BNY Mellon to keep two seats for two employees who were no longer working for the bank, than giving them to plaintiff, 2nd- ranked employee in the quants group.

57. Moreover, without given any notice and justification, plaintiff frequently found his working software suddenly lost "license" and his workstation got renamed.

58. Furthermore, BNY Mellon removed plaintiff from the "Exotics and Bermudan Risk Management Reports", the daily "DerivTradeOps" check list for BERM book, from July 10, 2014. There is no reasonable business motive to support this action as plaintiff had just helped the desk to correct a couple of "bugs" and implemented the Q-model

6

for the BERM book. How come his name was removed from the very email list concerning the BERM trades check? Can this be explained better than retaliation?

59. Contrary to BNY Mellon's assertion that plaintiff was primarily responsible for structured products and Bermudan portfolio, not CVA[1], plaintiff has been the main person in the group doing the CVA work.

60. In or about 2010, plaintiff single-handedly built a CVA model with netting capacity for trades in single currency. In 2012, plaintiff developed the MCLMM[2] model, which makes netting possible for trades in all currencies. With the MCLMM as the core, plaintiff was able to extend the CVA model to multi-currency trades.

61. In 2012, the desk decided to launch the CVAF[3] project. Plaintiff played a key role in the CVAF's development as well. The CVAF eventually evolves into CVAF-SYS, the official CVA model in production for BNY Mellon Global Markets' derivatives trades.

62. Recognizing plaintiff's significant contribution to the CVAF project, in early 2013, Lu, plaintiff's supervisor and the quants group head, told plaintiff that he would be promoted to Managing Director ("M.D."). Contrary to BNY Mellon's assertion, plaintiff's M.D. promotion is totally unrelated to the 2010-2011 "protective activities" for PRDC book.

63. During the development and validation process, plaintiff questioned many flawed assumptions about the CVAF model, in particular, its treatment of "transition matrix", which were proposed and implemented by Lu. Per plaintiff's analysis, it may significantly under-estimate the CVA reserves when there exists a CSA (credit support annex) with rating based thresholds.

64. In addition, in July 2013, when plaintiff was doing a test run of CVAF-SYS vs CVAF vs CVA, plaintiff found that Lu introduced a "bias" into the CVAF-SYS, which may further significantly lower the BNY Mellon's CVA reserves for its derivatives portfolio. Lu rebuffed plaintiff's concern with some bogus excuses such as "for the design of efficiency."

65. Plaintiff reported the aforementioned issues to McAuliffe, the desk head, on October 8th, 2013, and used a live trade example to show him the potential problems of the CVAF model. However, plaintiff never received any response from McAuliffe about the issue.

66. In fact, Lu knew very well about the flawed model assumption issues (e.g. "transition matrix" and "bias") in the CVAF-SYS model, and that is why: in live pricing, the CVA model is used; while in production, the CVAF-SYS model is used, which may significantly undervalue the CVA reserves and thus greatly inflated profits. Such a Double-Dealing Scheme by running two intentionally inconsistent systems, is often used by Lu, etc. shielded by the desk management, to inflate the desk P&L, just as they did with the BERM book and PRDC book.

---

[1] CVA: Credit Valuation Adjustment.

[2] MCLMM: Multi-currency Libor Market Model.

[3] CVAF: CVA using forward induction.

67. At the end of October 2014, plaintiff, in hope that the wide-spread fraudulent practices at the BNY Mellon derivatives desk could be stopped and corrected, escalated the CVA issues and other booking issues to the Head of Risk, Maryann Watt ("Watt") and BNY Mellon CEO, Gerald Hassell. But after having two sit-down meetings with Watt and the Senior Counsel of BNY Mellon, Pedro Medrano ("Medrano"), and following-up with further emails, plaintiff received no meaningful response. And the communication completely stopped, with the last email from Medrano on December 18, 2014.

68. In September 2014, after unwinding PRDC book with substantial losses, BNY Mellon decided to wind down part of the BERM book in October 2014.

69. By March 2015, BNY Mellon unwound a lot of BERM trades but still kept many trades with Municipalities.

70. The remaining BERM trades are error-prone and intentionally kept because such counterparties as Municipalities are easy victims to be cheated off, as they lacked the technical expertise to verify the complicated derivatives price. For example, on March 17, 2015, Seth A Markowitz (a mid-office employee) informed the desk about pricing discrepancy for some BERM trades with a major Muni-housing authority. Plaintiff examined and explained that the discrepancy was due to BNY Mellon's incorrect model assumption: the trade's partial exercise option is on "equal basis", not the "pro rata basis" as BNY Mellon erroneously assumed. Moreover, as early as 9/30/2014, plaintiff had already reported the issue and built the correct model for it. At that time, the P&L impact was only about $-119k, but now, less than a half year later, it quadrupled to be about $-800k. Plaintiff again proposed the "fix" to Lu but got ignored again. And to plaintiff's knowledge, the BNY Mellon still kept these trades on its book with the "bug" unfixed and fake profit uncorrected.

71. In late 2014, McAuliffe, the desk head, used the new found power in reduction-in-force ("RIF") selection to target those employees who dared to do the right thing.

72. In and about October 03, 2014, plaintiff found the routine "CVA FX vol calibration" in CVAF was not updating since January 03, 2014. When plaintiff reported the problem to Lu, his supervisor, Lu refused to review the issue, even refused to discuss it. So plaintiff escalated the issue to Edward Kutin ("Kutin"), a Risk manager at BNY Mellon. Even before Kutin started to do any investigation, he was fired the next day.

73. In fact, BNY Mellon never informed plaintiff that he was targeted in the RIF's action. On the contrary, plaintiff was assured of the employment as late as his last days at BNY Mellon. On March 13, 2015, plaintiff received a "business as usual" email from his supervisor, Lu, about setting the goals for 2015, which clearly shows no hint that plaintiff's employment would end in two months. And in April 2015, McAuliffe called the whole desk staff, which includes the plaintiff's "Quantitative Analyst" ("quants") group, into the conference room and announced, "The RIF was finished and everyone in the room is safe."

74. But on May 21, 2015, after lunch, McAuliffe called plaintiff into HR office and informed plaintiff that he was fired, effective immediately.

75. Plaintiff's February 19, 2011 Incident Report 383206 addressed what he reasonably believed to be an example of the scheme BNY Mellon derivatives desk used to falsify profits by manipulating derivatives trade's booking. This is further evidenced by the fact that the desk management refused to make immediate correction for the faked position (and hence to keep the faked profit) until the trade was triggered and gone.

76. Plaintiff's mid-2013 to mid-2014 reporting and correcting of "bugs" in BERM book, such as Day-Count error, addressed what he reasonably believed to be another example of the scheme BNY Mellon derivatives desk used to falsify profits by embedding bugs in production code. This is further evidenced by the fact that the desk management obstructed the correcting process in order to keep the faked profits for as long as possible.

77. Plaintiff's October 2014 escalation of CVAF-SYS issues to BNY Mellon's top officials addressed what he reasonably believed to be another example of the scheme BNY Mellon derivatives desk used to falsify profits by intentionally embedding flawed model assumptions (e.g. "transition matrix" and "bias") into the bank's CVA model system. This is further evidenced by the fact that, in response, the desk management as well as BNY Mellon's top officials ignored the frauds, sidelined the whistleblower, and shielded the wrong doers in order to keep the faked profits for as long as possible.

78. Plaintiff's aforementioned reporting activities specifically addressed what he reasonably believed to be the scheme BNY Mellon derivatives desk used to falsify profits in violation of section 1341, 1344, or 1348, the rules and regulations of the Securities and Exchange Commission and/or any provision of the federal law relating to fraud against shareholders

79. In reporting to desk management and top officials at BNY Mellon, plaintiff was engaging in protected activity under the Act, and BNY Mellon's Code of Conduct.

80. Defendant was aware that plaintiff engaged in protected activity throughout his career at BNY Mellon.

81. In response to plaintiff's protective activities, defendant retaliated against plaintiff by cutting his bonus payments and/or downgrading his performance rating.

82. Furthermore, in response to plaintiff's protective activities, defendant retaliated against plaintiff by harassing and sidelining him.

83. Defendant made the decision to terminate plaintiff because of his protected activity from mid-2010 through early 2015.

84. Defendant terminated plaintiff on May 21, 2015.

85. Defendant's purported reason for terminating plaintiff on May 21, 2015 was and is false and pretextual.

86. Defendant's termination of plaintiff on May 21, 2015 was a violation of the Act.

87. Defendant's termination of plaintiff on May 21, 2015 was motivated, at least in part, by plaintiff's protected activity.

88. Plaintiff's protected activity was a contributing factor in defendant's termination of plaintiff on May 21, 2015.

89. Defendant retaliated against plaintiff for engaging in protected activity in violation of the Act, and BNY Mellon's own Code of Conduct which were based on the Act.

## **FIRST CLAIM FOR VIOLATION OF SARBANES-OXLEY ACT**

90. Plaintiff repeats and realleges paragraphs "1" through "89" as set forth above.

91. Rather than properly investigating plaintiff's good faith complaints about the schemes BNY Mellon derivatives desk used to falsify profits, defendant unlawfully retaliated against plaintiff for his protective activities by cutting his bonus pay, removing his name from the business email list and renaming/removing his second workstation for no good business reason, and eventually terminated plaintiff on May 21, 2015, in violation of the Act.

92. Plaintiff's protected activities were a contributing factor to his termination on May 21, 2015.

93. Defendant's many retaliations and termination of plaintiff on May 21, 2015 were violations of the Act.

94. Defendant's purported reason for terminating plaintiff was and is a pretext for violation of the Act.

95. As a result of his unlawful termination on May 21, 2015, plaintiff was caused to and continues to suffer loss of wages, loss of benefits, and loss of reputation.

96. As a result of his unlawful termination on May 21, 2015, plaintiff has been and will be caused to incur attorneys' fees, expert witness fees, and the costs of litigation.

97. As a result of his unlawful termination on May 21, 2015, plaintiff was caused to and continues to suffer emotional distress, depression and psychological injuries.

98. As a result of his unlawful termination on May 21, 2015, plaintiff should be reinstated to his former position with the same seniority he would have had but for the unlawful termination of his employment in violation of the Act.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests that upon trial this Court enter judgment:

A. Declaring that the actions and practices of defendant violated the Sarbanes-Oxley Act and adjoining such violations;

B. Directing defendant to make plaintiff whole by providing him reinstatement with the same seniority he would have had but for the defendant's unlawful termination, back pay with interest, benefits, and compensatory damages for loss of reputation, emotional distress, depression and psychological injuries;

C. Awarding plaintiff special damages for litigation costs, reasonable attorney's fees, expert witness fees and costs as provided by the Sarbanes-Oxley Act; and

D. Granting such additional relief as this Court deems just and proper.

## **JURY DEMAND**

    Pursuant to 18 U.S.C §1514A (b) (2) (E), plaintiff demands a trial by jury on all claims triable by jury.


Dated:   August 28, 2017



                              Respectfully submitted

                              Yan Li, Ph. D.

                              yli_8@yahoo.com

                              5 Bordens Brook Way

                              Holmdel, NJ 07733

                              (732) 946-2783